IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 20, 2018 Session

**JAMES M. MEESE v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Wilson County
No. 12-CR-844, 14-CR-1000, 14-CR-999, 14-CR-906, 14-CR-935   Brody N. Kane,
Judge**

_____

**No. M2017-00909-CCA-R3-PC**

_____

The Petitioner, James M. Meese, entered guilty pleas to aggravated statutory rape, aggravated assault, simple possession of marijuana, and contributing to the delinquency of a minor, with a negotiated Range I seven-year sentence to be served on probation.  The Petitioner filed a post-conviction petition, asserting that his trial counsel failed to properly investigate his charges and inaccurately advised him regarding his cumulative exposure.  We conclude that trial counsel was ineffective in failing to accurately advise the Petitioner of his range of punishment and that as a result, the Petitioner did not knowingly enter into the plea agreement.  Accordingly, we reverse the post-conviction court's judgment, and we remand for a new trial on all charges.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Criminal Court Reversed;
Case Remanded**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and CAMILLE R. MCMULLEN, JJ., joined.

Donnavon Vasek, Lebanon, Tennessee, for the appellant, James M. Meese.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Tom P. Thompson, Jr., District Attorney General; and Tom Swink, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## FACTUAL AND PROCEDURAL HISTORY

The Petitioner's guilty pleas were the result of different offenses committed between June 2012 and November 2014. According to the prosecutor's recitation of facts at the plea colloquy, on July 18, 2012, the sister of fifteen-year-old Victim 1 discovered Victim 1 and the twenty-six-year-old Petitioner, both shirtless, in a bed together. Victim 1 disclosed that she and the Petitioner had sexual intercourse on two prior occasions, once in June and once in July 2012. The Petitioner made incriminating statements during a video recorded interview with law enforcement. Accordingly, on August 15, 2012, the Petitioner was charged with two counts of aggravated statutory rape committed in June and July 2012 against Victim 1.

On August 3, 2014, the Petitioner and two other men were discovered in a hotel room with a runaway juvenile, marijuana, pills, and drug paraphernalia. The men all denied knowledge of the drugs, but the juvenile told police that all present had smoked marijuana. The Petitioner was charged in two indictments with four misdemeanor offenses: contributing to the delinquency of a minor, possession of a legend drug, possession of drug paraphernalia, and possession of marijuana.

On December 10, 2014, the Petitioner was charged with an auto burglary committed against a third victim in November 2014. The record does not contain further information regarding this charge.

The Petitioner was also charged on December 10, 2014, with four felonies committed on November 13, 2014 against Victim 2: aggravated burglary, aggravated assault, kidnapping, and attempted rape. At the plea hearing, the prosecutor told the trial court that Victim 2's testimony would support a conviction for aggravated assault but "would not really back up the other charges." The prosecutor summarized that the Petitioner was at Victim 2's home, that there was a physical altercation, and that the Petitioner's assault on Victim 2 resulted in a cervical fracture in her neck.

The Petitioner entered into a plea agreement in which he was to plead guilty to one count each of aggravated statutory rape, aggravated assault, simple possession of marijuana, and contributing to the delinquency of a minor. The Petitioner was to be sentenced to a probationary sentence of two years for aggravated statutory rape, five years for aggravated assault, and eleven months and twenty-nine days for each misdemeanor. The felony convictions were to be served consecutively to one another and concurrently with the misdemeanor convictions for an effective sentence of seven years of probation.

At the plea hearing, the trial court reviewed the Petitioner's plea forms and potential exposure. The court noted that the Petitioner was facing a sentence of two to twelve years for each Class D felony committed against Victim 1, three to fifteen years for each of the four Class C felonies committed against Victim 2, and one to six years on the auto burglary charge. The plea forms reflected the same range of punishments for the felony offenses. The trial court reviewed the terms of the agreement, and the Petitioner agreed that the facts as recited by the prosecution reflected the evidence that the State would have presented at trial. The Petitioner told the court that no one had promised him anything or pressured or coerced him into entering into the plea agreement, and the pleas were entered on March 13, 2015.

After the Petitioner was charged with violating his probation, he filed a petition for post-conviction relief, alleging various errors committed by trial counsel. The Petitioner's probation was revoked, and he was ordered to serve ninety days in confinement and the remainder of the sentence on probation. Following his release, he was again charged with violating the terms of his probation. His probation was revoked, and he was ordered to serve his sentence in confinement.

The post-conviction court found that the Petitioner had presented a timely and colorable claim, and the court appointed counsel, who filed an amended petition. Among the Petitioner's claims were that his trial counsel failed to interview certain witnesses and that his trial counsel grossly overestimated the maximum prison sentences which could apply to him. He also argued that his pleas were not knowing and voluntary.

Victim 2 testified at the hearing that she was in a relationship with the Petitioner in 2014 but that the Petitioner did not live at her house. On November 12, 2014, Victim 2 was working when the Petitioner sent her a text message to see where she was. She acknowledged having sent him two text messages asking where he was, but she explained that he had contacted her earlier and that she was trying to ascertain his whereabouts to see if she could go to her home or if she would have to seek shelter at her father's home. After Victim 2 went home, the Petitioner came to her house and began throwing rocks at the window, asking her through text message if he could come in. She did not allow him to enter, and she went to sleep. Victim 2 testified that when she woke up, the Petitioner was in the home. She stated that her bathroom window had been cracked and boarded up but that the Petitioner broke the window completely. She and the Petitioner argued, and the Petitioner twisted her neck and broke it during the three-hour altercation. She was unable to escape because he was with her the entire time and because he took her telephone and keys. She acknowledged biting the Petitioner numerous times.

- 3 -

Victim 2 testified that the Petitioner took her to her car and threatened to put her in the trunk and drive off a cliff. He opened the trunk but did not follow through with the plan because the trunk was full. While they were at the car, Victim 2 managed to secure an extra cellular telephone from the vehicle. She was ultimately able to call 911 from a locked room before the Petitioner broke down the door and sat on her, "trying to smother" her. Victim 2 acknowledged having filed a complaint against the Petitioner and her father for taking a car belonging to her in October 2014. She stated that the facts recited in that complaint were true but that she got her vehicle back and the matter was ultimately dismissed.

Victim 2 was contacted so often by trial counsel that she asked him to stop calling her. She met with trial counsel and the prosecutor and gave them her medical records.

Victim 2 testified about the Petitioner's continued harassment of her. She stated the Petitioner had attempted to contact her on social media through fake accounts and had sent her hundreds of letters, asking her to lie in court in about five or six of them. Several communications from the Petitioner, which were delivered to Victim 2 by means of his relatives, were introduced into evidence, including a hand-drawn portrait of Victim 2. Victim 2 testified that her father temporarily removed his mailbox to avoid receiving further communications from the Petitioner. Video cameras set up at Victim 2's father's home showed the Petitioner lurking on the premises. Victim 2 acknowledged having written to the Petitioner when he was first arrested that she was "sorry he was locked up," would help out, and would tell trial counsel "what went on that night."

Victim 2's father testified that he tried to "stay out of all this" and could not recall if he spoke to trial counsel. After the Petitioner's assault, Victim 2 had a fractured neck, was in pain, and had to wear a neck brace. The Petitioner told Victim 2's father that he was sorry. Victim 2's father confirmed that the Petitioner continued to harass Victim 2 and stated that Victim 2 and her children had to move to his house for safety. He testified that Victim 2's complaint regarding the stolen vehicle was true and that he took her vehicle because she owed him money.

The Petitioner testified that he was initially represented by the public defender's office but that all of his claims relate to alleged deficiencies on the part of the appointed attorney who subsequently represented him ("trial counsel"). The Petitioner testified that while the public defender represented him on his 2012 charges, he rejected two plea offers involving a suspended sentence because he was adamant that he wanted to proceed to trial. After trial counsel was appointed, the Petitioner repeatedly asked trial counsel to set the cases for trial.

- 4 -

The Petitioner testified regarding various witnesses who he felt were not adequately investigated by trial counsel. According to the Petitioner, trial counsel did not investigate the fact that Victim 2 had a violent past and that she had initiated the physical confrontation. The Petitioner also faulted trial counsel for not investigating Victim 2's attempted rape allegation, which the Petitioner stated was premised on the fact that he accidentally stepped on her pajama pants.

The Petitioner asserted that trial counsel failed to interview his bondsman, Ms. Janice Frizell, who could have corroborated the fact that he sustained several injuries in the altercation with Victim 2. He acknowledged that his mug shot taken on November 14, 2014, showed no wounds. He faulted trial counsel for not interviewing Victim 2's father, Victim 1, or Mr. Michael Bagley. Mr. Michael Bagley could have testified to the fact that the Petitioner could not have had intercourse with Victim 1 on a particular day in June 2012. Trial counsel told the Petitioner that the Petitioner would be found guilty and that the jury would believe the victims.

The Petitioner testified that he had an eighth-grade education and that he had several traffic offenses and had been charged with simple possession of a drug many years ago. At the time of the pleas, the Petitioner had no felony convictions. The Petitioner shared this information with trial counsel.

The Petitioner was provided with papers detailing his exposure, and these were entered as exhibits at the hearing. He was given a chart detailing the authorized sentences for each felony classification and each offender range. The form included a chart to guide range calculation, reflecting that a Range II offender would have "2-4 priors in class, higher, or 2 down…." The Petitioner was also given a paper detailing his exposure for the offenses at issue. The paper reflected that the Petitioner could receive a Range I sentence of 2-4 years for the Class D aggravated statutory rape charges. For the Class E auto burglary charge, the document reflected that he could receive a Range I or Range II sentence of 1-4 years. For the Class C felony offenses committed against Victim 2, the document noted that the Petitioner could be sentenced from 3-15 years, which would be a sentence spanning from Range I to Range III. The document summarized that the punishment was "[p]otentially, up to a total of – 20.50 – 75.50 years." The Petitioner testified that he was a Range I offender at the time of the plea hearing and that he thought the numbers reflected the minimums and maximums for a Range I offender.

The Petitioner testified that trial counsel told him he would receive the maximum punishment for the aggravated statutory rape charges, and the Petitioner believed that both the minimum and maximum for the offense was an aggregate eight years. He later testified he thought he could serve twelve years for each conviction. Trial counsel also

told him he would receive the maximum sentences for his other felony convictions, and trial counsel told him that the maximum sentence was fifteen years. The Petitioner testified trial counsel told him he could be a Range II or Range III offender on the auto burglary charge, depending on when it would be tried. According to the Petitioner, trial counsel also told him that the misdemeanors were mandatorily consecutive to the aggravated statutory rape offenses because they had been committed while he was on bond. The Petitioner testified that trial counsel repeatedly told him he was facing life in prison, with a possible aggregate sentence of 75.5 years. The Petitioner averred that he would not have entered the guilty pleas if he had known his actual maximum exposure as a Range I offender. He did not want to enter guilty pleas, was "seething mad," and felt forced to enter into the agreement. He testified that trial counsel told him that the judge would not delay trial in order to permit him time to seek a new attorney. He acknowledged that he told the court at the plea hearing that he was not being pressured or coerced to enter into the plea agreement.

The Petitioner also testified that trial counsel did not review all of the community supervision provisions of his plea and that trial counsel told him he would be permitted to be around Victim 2's children and his nephews and would be able to get off the sexual offender registry in twelve years. The Petitioner acknowledged he was given a written copy of the registry requirements and that trial counsel noted at the top of the form that he had reviewed it with the Petitioner.

Trial counsel testified that his practice at the time he represented the Petitioner was focused primarily on real estate and business law but that he also represented clients on criminal matters. He first represented the Petitioner only on the aggravated statutory rape charges but was later appointed to represent him on all the offenses. He was aware of the Petitioner's educational level but testified that the Petitioner was "a very intelligent person." He agreed that the Petitioner mentioned several times that he wanted to proceed to trial and that the Petitioner had hesitation about entering a plea.

Trial counsel interviewed Mr. Michael Bagley when the Petitioner told him that Mr. Bagley would have helpful information. Jail records documenting the visit were entered into evidence. Mr. Michael Bagley had six theft convictions, described himself as not credible, and ultimately told trial counsel that he had not been with the Petitioner every time the Petitioner was with Victim 1 but that he would "say whatever Mr. Meese wants me to say." Trial counsel also drove by the Bagley home in order to ascertain the location of a shed the Petitioner had mentioned. Mr. Michael Bagley mentioned another witness who was a minor, but trial counsel did not interview that witness. Trial counsel testified that the witness appeared to be "secondary" and that he felt the witness "may or may not know" anything about the case.

The Petitioner did not tell trial counsel about Ms. Frizzell as a potential witness. Trial counsel agreed that the Petitioner's mug shot reflected that he did not have scratches on his neck.

Trial counsel also investigated Victim 2, contacting her numerous times until she agreed to meet with him and the prosecutor. While the prosecutor had stated at the plea hearing that the charges other than aggravated assault would not be supported by her testimony, trial counsel disagreed with that analysis of her anticipated testimony. He stated that "the only case that she really came off was the attempted rape," and that he believed "in the bottom of my heart she was pressured to do that." Victim 2 brought medical records documenting her broken neck to the meeting with trial counsel. Trial counsel testified that Victim 2's father's testimony would not have been helpful to the defense. Trial counsel recalled that the Petitioner made a statement to police indicating that Victim 2 had told him to leave her home and that he had returned without her permission due to the cold.

Trial counsel recalled that plea negotiations resulted from the trial court granting in part a motion to suppress. In particular, the trial court suppressed evidence that the Petitioner and Victim 1 were discovered shirtless in bed. Trial counsel stated that the Petitioner made incriminating statements on his video statement to police regarding Victim 1, and he also made incriminating statements to trial counsel, including that sex with underage girls "was better" and that he and Victim 1 "didn't have sex that particular night because she was on her period," implying that they had had intercourse on another occasion.

Trial counsel testified that he did not obtain the Petitioner's criminal history and did not know for certain if the Petitioner had prior convictions. The Petitioner told trial counsel that he had a "felony escape conviction or something like that," and trial counsel recalled some uncertainty regarding whether the Petitioner was adjudicated as a juvenile or an adult in that case. The Petitioner had "numerous" other arrests, including for aggravated assault, and trial counsel worried he might have had other felony convictions.

Trial counsel testified that he and the Petitioner discussed the offender classification applicable to the Petitioner and where the offenses fell on the chart. He acknowledged telling the Petitioner that the Petitioner could spend the rest of his life in prison, noting that even if the Petitioner were sentenced as a Range I offender and received a sentence of "thirty something years," the revocation or denial of parole could mean that the sentence would constitute the rest of his life. He acknowledged that the plea agreements listed the entirety of the range of sentences authorized by statute without reference to the Petitioner's particular range. He did not recall if he incorrectly told the Petitioner that his misdemeanors would mandatorily be run consecutively to his other

crimes. He denied telling the Petitioner that he would be found guilty on all charges or that he would receive the maximum sentences.

Trial counsel advised the Petitioner regarding the consequences of his sexual offenses and told him he would not be able to see Victim 2's children. Trial counsel offered to research the date that the Petitioner would be eligible to be removed from the sexual offender registry, but the Petitioner indicated that the issue was not important to him.

With the State's acquiescence, the post-conviction court allowed the Petitioner to present the testimony of Mr. Ryan Bagley, which would purportedly have been similar to that of Mr. Michael Bagley. Mr. Ryan Bagley testified that on November 13, 2012,[1] the Petitioner and another family member went to pick up Victim 1 at 7:00 p.m. When the Petitioner and Victim 1 arrived at Mr. Ryan Bagley's home, they remained in the living room with Mr. Ryan Bagley's father. Mr. Ryan Bagley's uncle got hit by a car and was taken to the hospital at 11:00 p.m., and all present went to the hospital. They stayed together at the hospital until 3:00 a.m. The Petitioner, Victim 1, and Mr. Ryan Bagley returned home, and Mr. Ryan Bagley went to bed at around 4:00 a.m., leaving the Petitioner and Victim 1 in the living room.

Ms. Janice Frizzell, the Petitioner's bonding agent, testified that she saw the Petitioner on November 13, 2014, that he had severe bite marks, and that he had several scratches on his neck. At the time, the Petitioner denied committing a crime against Victim 2. Ms. Frizzell testified that the Petitioner stayed with Victim 2 and with Victim 2's father. She acknowledged seeing Victim 2 in a cervical collar after the incident, and she acknowledged that the Petitioner's mug shot showed no scratches on his neck.

The public defender who represented the Petitioner testified that she represented him only with regard to the aggravated statutory rape charges. The Petitioner asserted that Mr. Michael Bagley would give favorable testimony, but when the public defender interviewed Mr. Bagley, she discovered that her office had a conflict of interest. The public defender testified that, during her representation, she advised the Petitioner regarding his potential sentencing exposure. She confirmed that the Petitioner asserted his innocence and wanted to proceed to trial during the entirety of her representation. On cross-examination, she testified that Mr. Michael Bagley did not want to be a witness for the Petitioner.

---

[1] While it is evident that Mr. Ryan Bagley's testimony was meant to show that the Petitioner could not have had intercourse with Victim 1 in June 2012, he agreed numerous times that his testimony related to events on November 13, 2012. The crimes against Victim 2 took place on November 13, 2014.

The Petitioner introduced the expert testimony of Attorney Thomas Maynard, who testified that he had researched the Petitioner's criminal history and that the Petitioner had no prior felony convictions at the time of the pleas. He testified that an attorney should advise a client regarding the correct range of punishment. In his opinion, the Petitioner would not have been a Range III offender for any of his offenses, and the Petitioner's exposure was less than reflected in the document provided by trial counsel. He acknowledged that the standard in the judicial district was to include the full possible range of punishment, without reference to offender classification, in the plea agreement.

The post-conviction court denied relief. The post-conviction court found that, despite his abbreviated education, the Petitioner was able to grasp the legal issues at play, had "an extended vocabulary," and was "well equipped to express himself." The post-conviction court noted that the Petitioner had previously given testimony which the court had deemed not credible, and the post-conviction court made a blanket finding that the Petitioner was not "credible or believable." The post-conviction court credited trial counsel's testimony when it was in conflict with the Petitioner's.

Regarding a failure to interview witnesses, the post-conviction court found that trial counsel was never made aware that Ms. Frizzell had information pertinent to the cases, that trial counsel attempted to interview Victim 1, that Victim 2's father's testimony was not favorable to the Petitioner, and that trial counsel adequately investigated Victim 2 and Mr. Michael Bagley. The post-conviction court also found that Mr. Ryan Bagley's testimony would not have exculpated the Petitioner of the charged offenses.

Regarding sentencing, the post-conviction court found that trial counsel erroneously advised the Petitioner that the sentences for his misdemeanor offenses would have to be served consecutively by law. The post-conviction court, however, concluded that given the relative importance of these crimes in the charges, the error was "de minimis and was not deficient from the range of competence expected of a criminal defense attorney." The post-conviction court found that the highest sentence the Petitioner could have received would have been thirty-six years of incarceration for his felony offenses. The post-conviction court found that trial counsel incorrectly advised him regarding his maximum exposure but concluded that it "c[ould not] find that this error standing alone was so significant as to deviate from the range of reasonableness provided by criminal defense attorneys." It noted that the public defender correctly advised the Petitioner of his potential range of punishment. The post-conviction court found that the pleas were not involuntary, that trial counsel did not perform deficiently, and that the Petitioner had failed to show that but for any error, he would have gone to trial.

**ANALYSIS**

Under the Post-Conviction Procedure Act, a petitioner is entitled to relief when "the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. The burden of proving allegations of fact by clear and convincing evidence falls to the petitioner seeking relief. T.C.A. § 40-30-110(f). The post-conviction court's findings of fact are binding on the appellate court unless the evidence preponderates against them. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). Accordingly, the reviewing court defers to the post-conviction court's findings regarding the credibility of witness, the weight and value of witness testimony, and the resolution of factual issues. *Id.* Questions of law and mixed questions of law and fact are reviewed de novo. *Id.* Each element of a claim of ineffective assistance of counsel is a mixed question of fact and law reviewed de novo. *Id.* Whether a guilty plea was entered knowingly and voluntarily is also a mixed question of fact and law reviewed de novo, with a presumption of correctness afforded to the factual findings of the post-conviction court. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003).

**I. Ineffective Assistance of Counsel**

Both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee the accused the right to counsel. This right has been defined as the right to reasonably effective assistance of counsel, or assistance "'within the range of competence demanded of attorneys in criminal cases.'" *Vaughn v. State*, 202 S.W.3d 106, 116 (Tenn. 2006) (quoting *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999)). The overall standard of effectiveness is "'whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 686 (1984)).

In order to establish that he received the ineffective assistance of counsel, a petitioner must show both that his lawyer's performance was deficient and that the deficiency resulted in prejudice. *Pylant v. State*, 263 S.W.3d 854, 868 (Tenn. 2008). Deficiency can be shown if the petitioner demonstrates that his attorney's services fell below an objective standard of reasonableness under prevailing professional norms. *Id.* A petitioner must demonstrate deficiency by "'showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" *Felts v. State*, 354 S.W.3d 266, 276 (Tenn. 2011) (quoting *Strickland*, 466 U.S. at 687). A reviewing court indulges "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. The court presumes that counsel's acts might be sound trial

- 10 -

strategy, and strategic decisions, when made after a thorough investigation, are "virtually unchallengeable." *Felts*, 354 S.W.3d at 277 (quoting *Strickland*, 466 U.S. at 690).

To prevail on the prejudice prong, the petitioner "'must establish a reasonable probability that but for counsel's errors the result of the proceeding would have been different.'" *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (quoting *Vaughn*, 202 S.W.3d at 116). A reasonable probability is "'a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Vaughn*, 202 S.W.3d at 116). The *Strickland* standard for determining whether a petitioner received the ineffective assistance of counsel applies in plea negotiations as well as during trial. *Hill v. Lockhart*, 474 U.S. 52, 58 (1985); *see also Missouri v. Frye*, 566 U.S. 134, 147-48 (2012). In order to show prejudice in the context of a guilty plea, the petitioner must demonstrate "'a reasonable probability that, but for counsel's errors, he would not have pled guilty and would have insisted on going to trial.'" *Grindstaff v. State*, 297 S.W.3d 208, 217 (quoting *Hill*, 474 U.S. at 59). The inquiry should focus on whether any alleged deficiency affected the outcome of the plea process. *Id.* Accordingly, a petitioner is under no requirement to prove that the result at trial would have been more favorable than the result of the plea agreement. *Id.* A claim may be denied for failure to prove either prong, and a court need not address both prongs if the petitioner has failed to establish either deficiency or prejudice. *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996).

## A. Failure to Investigate

On appeal, the Petitioner asserts that trial counsel was deficient in failing to interview Ms. Frizzell or Mr. Ryan Bagley. The Petitioner testified that trial counsel should have interviewed Ms. Frizzell, who would have corroborated his story that Victim 2 assaulted him. Trial counsel, however, testified that the Petitioner never informed him that Ms. Frizzell was a potential witness who could give favorable testimony, and the post-conviction court credited trial counsel's testimony. "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Felts*, 354 S.W.3d at 277 (quoting *Strickland*, 466 U.S. at 691). Accordingly, trial counsel, unaware of the existence of Ms. Frizzell, was not deficient in failing to interview her. Neither has the Petitioner established a reasonable probability that, but for trial counsel's failure to interview Ms. Frizzell, he would not have pleaded guilty. Ms. Frizzell's testimony only corroborated that there was a physical altercation between Victim 2 and the Petitioner, a fact not in controversy, and her statements regarding the Petitioner's injuries were called into question by a contemporaneous photograph and her own acknowledgement that Victim 2 had a fractured neck.

Mr. Ryan Bagley testified that he was with the Petitioner and Victim 1 on a date in 2012 and that they did not have sexual intercourse prior to 4:00 a.m. on that particular

date. Trial counsel testified that he was aware that there was a minor witness who had some knowledge of the circumstances of the aggravated statutory rape but that he deemed the witness to be "secondary" and did not interview him. The Petitioner represented that Mr. Ryan Bagley's testimony was similar to the anticipated testimony of Mr. Michael Bagley, and trial counsel met with Mr. Michael Bagley and determined his testimony would not be helpful or credible. Although trial counsel did not interview Mr. Ryan Bagley, "'strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Id.* (quoting *Strickland*, 466 U.S. at 690-91). The post-conviction court's finding on the matter, that Mr. Ryan Bagley's testimony "left open the opportunity for [the Petitioner] and the underage victim to engage in sexual relations," is a finding that the Petitioner suffered no prejudice. Mr. Ryan Bagley's testimony related to one particular date, and even if his testimony had related to a date in June 2012, as charged in count 1, or July 2012, as charged in count 2, the testimony would not have excluded the possibility that the Petitioner was with Victim 1 on other dates during those months. The Petitioner was aware of the testimony that Mr. Ryan Bagley could offer, and he has made no showing that, but for trial counsel's failure to investigate potential testimony from both Bagleys, he would not have accepted the plea offer. Accordingly, he is not entitled to relief.

## B. Incorrect Sentencing Advice

The Petitioner also asserts that trial counsel inflated his actual sentencing exposure by advising him that he could be sentenced as a Range III offender. The Petitioner argues that trial counsel informed him he could go to prison for 75.5 years when his actual felony exposure was thirty-four years, plus three years for his misdemeanor crimes. The State responds that trial counsel's testimony established that he informed the Petitioner that his offender classification would hinge on any prior convictions and that trial counsel's advice was "broad" but "not inaccurate." The State likewise points to the strength of the evidence and the Petitioner's comparatively light sentence to argue that the Petitioner has failed to establish prejudice. The post-conviction court concluded that although trial counsel's advice may have been erroneous, it "c[ould not] find that this error standing alone was so significant as to deviate from the range of reasonableness provided by criminal defense attorneys."

A petitioner has a right to the effective assistance of counsel in the plea-bargaining process. *Lafler v. Cooper*, 566 U.S. 156, 162 (2012). During plea bargaining, trial counsel has the duty to promptly communicate and explain any plea offers extended by the prosecution. *Nesbit v. State*, 452 S.W.3d 779, 800 (Tenn. 2014). Trial counsel must provide the accused "'with competent and fully informed advice, including an analysis of the risks that the client would face in proceeding to trial.'" *Id.* (quoting *Burt v. Titlow*,

571 U.S. 12, 25 (2013) (Sotomayor, J., concurring)). An attorney should "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." Tenn. Sup. Ct. R. 8, RPC 1.4(b). Counsel should advise the accused "of the choices that are available to him as well as the probable outcome of these choices." *Parham v. State*, 885 S.W.2d 375, 384 (Tenn. Crim. App. 1994).

A failure to provide advice regarding sentencing exposure may constitute deficiency. *Moss v. United States*, 323 F.3d 445, 474 (6th Cir. 2003). Counsel must "ensure that the client's decision [to waive his constitutional right to trial] is as informed as possible." *Miller v. Straub,* 299 F.3d 570, 580 (6th Cir. 2002). To that end, counsel should explain the sentencing exposure attached to each option available to the defendant. *Smith v. United States*, 348 F.3d 545, 553 (6th Cir. 2003). "Knowledge of the comparative sentence exposure between standing trial and accepting a plea offer will often be crucial to the decision whether to plead guilty." *United States v. Day*, 969 F.2d 39, 43 (3d Cir. 1992).

The Tennessee Supreme Court has cited the American Bar Association ("ABA") Standards for Criminal Justice in evaluating deficiency. *Grindstaff*, 297 S.W.3d at 220. According to the ABA Standards, defense counsel should "investigate the facts relevant to sentencing" and seek discovery regarding the relevant information. ABA Standard 4-8.3(d). Counsel also is under a duty to investigate "potential dispositions and penalties." *Id.* 4-4.1(b). "Before accepting or advising a disposition, defense counsel should request that the prosecution disclose any information that tends to negate guilt, mitigates the offense or is likely to reduce punishment." *Id.* 4-6.2(d). Defense counsel also "should become familiar with the client's background, applicable sentencing laws and rules, and what options might be available as well as what consequences might arise if the client is convicted." *Id.* 4-8.3(a).

Erroneous advice regarding sentencing also may establish deficiency. *Calvert v. State*, 342 S.W.3d 477, 488, 490 (Tenn. 2011) (citing cases in which incorrect sentencing advice was found to be deficient and concluding that failure to advise regarding lifetime community supervision constituted deficient performance); *Grindstaff*, 297 S.W.3d at 221-22 (granting relief where the petitioner pled guilty in reliance on trial counsel's mistaken advice that he was eligible for an alternative sentence); *Walton v. State*, 966 S.W.2d 54, 55 (Tenn. Crim. App. 1997) (remanding for evidentiary hearing on the petitioner's claim that trial counsel gave him erroneous advice regarding parole eligibility, causing him to plead guilty); *see Gordon Wayne Davis v. State*, No. E2015-00772-CCA-R3-PC, 2016 WL 4737010, at *9 (Tenn. Crim. App. Sept. 9, 2016) (noting that this court has granted relief when a "guilty plea is entered after having been significantly misinformed" and granting post-conviction relief to petitioner who was

erroneously informed he would be eligible for sentencing reduction credits and had rejected previous, comparable plea agreement) *no perm. app. filed*.

A defendant convicted of a felony offense may be subject to a sentence as a Range I, standard offender; a Range II, multiple offender; a Range III, persistent offender; or a Range III, career offender based upon the defendant's prior felony convictions. *See* T.C.A. § 40-35-105(a); -106(a); -107(a); -108(a). There are multiple sources upon which defense counsel may reasonable rely in determining a defendant's criminal history for the purposes of ascertaining the defendant's applicable sentencing range. Defense counsel may rely upon the defendant's prior criminal history provided by the State in discovery. *See* Tenn. R. Crim. P. 16(a)(1)(E) ("Upon a defendant's request, the state shall furnish the defendant with a copy of the defendant's prior criminal record, if any, that is within the state's possession, custody, or control if the district attorney general knows — or through due diligence could know — that the record exists."). Defense counsel also may reasonably rely upon the defendant's own recollection of his or her criminal history. In the present case, trial counsel did none of these things and made no effort to determine the Petitioner's applicable sentencing range.

Rather, trial counsel testified that he did not know if the Petitioner had any prior convictions and that he accordingly advised the Petitioner of the potential maximums for Ranges I to III, providing him with a chart reflecting the increase in sentencing and its relationship to prior convictions. Trial counsel and the Petitioner discussed how "[y]ou would move up the chart as you were sentenced on any crimes you were convicted of based [on] prior convictions if you had any." When asked if he had advised the Petitioner that his range could increase if the cases were tried sequentially, trial counsel stated that the range would depend on "priors to all of these, like the felony escape or the aggravated assault or whatever." Trial counsel discussed release eligibility with the Petitioner, using the chart. Trial counsel acknowledged that the written form he provided the Petitioner reflected that he could be sentenced as a Range I offender for the aggravated statutory rape offenses, a Range I or II offender for the auto burglary, and a Range I to III offender for the Class C felonies committed against Victim 2. According to the paperwork trial counsel provided to the Petitioner, he faced a sentence of 20.5 to 75.5 years.

However, because none of the Petitioner's felony offenses had resulted in convictions at the time he committed the other offenses, he did not qualify to be a Range II or Range III offender on any of the felony offenses. *See State v. Bobby Lee Allen Robinette*, No. E2014-01688-CCA-R3-CD, 2015 WL 4745065, at \*5 (Tenn. Crim. App. Aug. 11, 2015) (citing *State v. Blouvett*, 904 S.W.2d 111, 113 (Tenn. 1995) for the proposition that a prior conviction is one which has been adjudicated prior to the commission of the offense at issue); *see also* T.C.A. §§ 40-35-106(b)(1); -107(b)(1); -

108(b)(1) (defining a "prior conviction" as "a conviction for an offense occurring prior to the commission of the offense for which the defendant is being sentenced"). Moreover, the sentences for the Petitioner's misdemeanor offenses committed while out on bail are not required to run consecutively to his other convictions. *See* Tenn. R. Crim. P. 32(c)(3)(C) (providing for mandatory consecutive service of felonies committed while the defendant is released on bail).

Although trial counsel advised the Petitioner that he faced a maximum sentence of 75.5 years, the parties agree on appeal that the Petitioner faced an aggregate maximum sentence thirty-four years as a Range I offender for his felony offenses and an additional three years for his Class A misdemeanor offenses. The State asserts that the advice given to the Petitioner — that his sentences would depend on the number of his prior convictions — was generally accurate. To adopt the State's position virtually would allow defense counsel to provide a defendant with Volume 7B of the Tennessee Code and instruct the defendant to figure it out himself. Rather, trial counsel must conduct adequate research of the sentencing provision and a reasonable investigation into the defendant's criminal history and must provide advice regarding the defendant's potential sentence that is tailored to the defendant's specific circumstances.

In this case, the document that trial counsel gave to the Petitioner informed him that he could be sentenced as a Range III offender for some of his crimes and that his maximum potential sentence was 75.5 years. Trial counsel never determined the Petitioner's actual range or informed him that his actual maximum punishment. We conclude that trial counsel was deficient in not advising the Petitioner of his actual potential range of punishment prior to the Petitioner's entering the guilty plea. The Petitioner was, and pled guilty as, a Range I offender, but trial counsel advised him that he could be sentenced as a Range III offender for his crimes. *See Dedrick Patton v. State*, No. M2003-00126-CCA-R3-PC, 2003 WL 22999443, at *5 (Tenn. Crim. App. Dec. 23, 2003) (holding that trial counsel was deficient in his investigation of the petitioner's criminal record and in failing to determine the petitioner's proper offender classification when trial counsel advised the petitioner that he qualified as a Range II offender when, in reality, the petitioner was a Range I offender).

Even though the public defender may have correctly advised the Petitioner regarding his sentencing exposure of eight years on the two charges of aggravated statutory rape then pending, this advice did not cure any later error committed by trial counsel in advising the Petitioner that he could go to prison for 75.5 years, especially in light of the fact that the Petitioner's plea agreement showed the full range of sentencing exposure. We are concerned that the record contains numerous references to the fact that it is standard practice within the judicial district to include the maximum statutory sentencing exposure in a written plea agreement without reference to the offender's

particular range. For instance, the post-conviction court noted that most plea agreements showed the full range of sentencing exposure and concluded, "I think in this district that's the standard. It probably would be preferable that everybody put the particular range for each particular defendant on the plea sheet, but that is not at all what is followed here in the five counties that I cover." The prosecutor also noted that it was "common practice … to go ahead and put on the plea form the maximum number of years exposure." The Petitioner's expert witness, confronted by plea agreements he had drafted which also reflected sentencing exposure without reference to offender classification, noted that he had previously had a plea agreement rejected by a *pro tempore* judge in the district because the agreement included only the punishments available in Range I to a Range I offender. However, he explained that he always informed his clients regarding their actual sentencing exposure, taking into consideration their offender classification. We observe that a defendant who enters a guilty plea should be advised regarding the maximum sentence he could receive were he to insist on going to trial with reference to his offender classification and not advised of the hypothetical sentence that some other offender with a more extensive criminal history could receive.

Having concluded that the Petitioner received deficient advice, we turn to the prejudice inquiry. In its brief, the State focuses upon the strength of the evidence against the Petitioner in arguing that trial court's deficiency did not result in prejudice. In order to establish prejudice, however, the Petitioner must show a reasonable probability that, but for any error, the Petitioner would have insisted on going to trial. *See Hill*, 474 U.S. at 59.

In *Dedrick Patton*, this court concluded that the erroneous advice that the Petitioner was a Range II rather than a Range I offender was prejudicial. 2003 WL 22999443, at *6. This court noted that the plea agreement was advantageous because the petitioner received a four-year sentence for a lesser-included offense when his minimum exposure was eight years for the charged offense. *Id.* Nevertheless, this court found that prejudice was established because both trial counsel and the petitioner had testified that the petitioner's exposure was a significant factor in his decision to plead guilty. *Id.* This court has also previously observed that, even if the decision to reject a guilty plea would have been unwise, "a defendant has the right to make a knowing, unwise decision." *Walton*, 966 S.W.2d at 55; *see Calvert*, 342 S.W.3d at 491 (concluding that failure to inform the petitioner of lifetime supervision requirement resulted in prejudice when the petitioner testified that it would have made a difference in his plea); *Grindstaff*, 297 S.W.3d at 222 (finding prejudice where the evidence showed that the petitioner had placed particular emphasis on the hope of alternative sentencing which was not available for his offense); *David Patrick Pearson v. State*, No. E2000-00438-CCA-R3-CD, 2001 WL 487684, at *9 (Tenn. Crim. App. May 9, 2001) (concluding that trial counsel's erroneous advice that the petitioner could be sentenced to over three hundred years in

prison was prejudicial when the petitioner did not enter a guilty plea until after the trial had commenced, demonstrating his desire to go to trial).

On the other hand, in *Allen P. Blye v. State*, the petitioner rejected a plea offer after he was advised that he would be a Range I offender with a maximum exposure of twenty-five years, when he was actually sentenced after trial as a Range II offender with a maximum exposure of sixty years. *Id.* at *8. The State conceded deficiency. *Id.* at *9. The petitioner testified both that he would have pled guilty had he received correct information regarding his exposure and, more equivocally, that he might have pled guilty. *Id.* at *9. Trial counsel testified that when the petitioner discovered he was a Range II offender, he told trial counsel that he wished he had known his actual exposure when presented with the plea offer but never indicated he definitely would have taken it. *Id.* at *9. Accordingly, this court found no prejudice. *Id.* This court also found no prejudice where the petitioner asserted that trial counsel advised him to accept a plea offer based on an erroneously calculated range, but the petitioner had acknowledged that "he did not really want to proceed to trial." *James Richard Blue, Jr. v. State*, No. M2013-02251-CCA-R3-PC, 2014 WL 2592802, at *7 (Tenn. Crim. App. June 10, 2014); *see also Moore v. United States*, 676 Fed. App'x 383, 386 (6th Cir. 2017) (concluding there was no prejudice from incorrect advice that maximum exposure was life in prison rather than forty years because no rational defendant would have rejected the plea offer).

Here, the Petitioner testified that he would not have entered his guilty pleas had he known his actual exposure. He also testified that trial counsel repeatedly told him that he was facing life in prison. Trial counsel acknowledged telling the Petitioner he could spend his life in prison, explaining that even if the Petitioner were sentenced as a Range I offender, the maximum thirty-seven-year sentence would essentially be for life if the Petitioner were denied parole or violated his parole. Trial counsel did not testify regarding the relative importance of the Petitioner's maximum exposure in his acceptance of the plea. However, the evidence at the hearing established that the Petitioner had initially insisted to both the public defender and trial counsel that he wanted to go to trial and that the Petitioner was reluctant to enter a guilty plea. The Petitioner was adamant at the post-conviction hearing that only the threat of spending his life in prison induced him to enter the guilty pleas. While the prejudice analysis here is less clear than in *Dedrick Patton*, where trial counsel testified that sentencing exposure was an important consideration in the petitioner's decision, or in *David Patrick Pearson*, where the petitioner had demonstrated his desire to go to trial, we conclude that the Petitioner has established a reasonable probability that, but for the inflated sentencing exposure, the Petitioner would not have pled guilty. While this may appear to be a bad decision, it is his decision to make. Accordingly, his convictions must be reversed and the case remanded for a new trial.

- 17 -

## II. Involuntary Plea

The Petitioner also challenges the voluntariness of his pleas, asserting that his mistaken belief that the alternative to a guilty plea was possibly a 75.5-year sentence rendered the pleas unknowing and involuntary. The State argues that the Petitioner was aware of the terms of his plea agreement and that any inaccuracy in estimating his maximum exposure did not render the pleas involuntary.

A guilty plea which is not entered knowingly or voluntarily amounts to a denial of due process. *State v. Mellon*, 118 S.W.3d 340, 345 (Tenn. 2003). Such a claim may properly be addressed through post-conviction proceedings. *State v. Wilson*, 31 S.W.3d 189, 194 (Tenn. 2000). The standard for determining the voluntariness of a plea is "'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" *Jaco,* 120 S.W.3d at 831 (quoting *North Carolina v. Alford*, 400 U.S. 25, 31 (1970). The court reviewing the voluntariness of a guilty plea must look to the totality of the circumstances, including:

> (1) the defendant's relative intelligence; (2) the defendant's familiarity with criminal proceedings; (3) the competency of counsel and the defendant's opportunity to confer with counsel about alternatives; (4) the advice of counsel and the trial court about the charges and the penalty to be imposed; and (5) the defendant's reasons for pleading guilty, including the desire to avoid a greater penalty in a jury trial.

*Howell v. State*, 185 S.W.3d 319, 330-31 (Tenn. 2006) (citing *Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993)). "'[A] plea is not "voluntary" if it results from ignorance, misunderstanding, coercion, inducements, or threats.'" *Ward v. State*, 315 S.W.3d 461, 465 (Tenn. 2010) (quoting *Mellon,* 118 S.W.3d at 345). More specifically, "[i]f a defendant receives incorrect legal advice, his or her guilty plea is potentially a product of 'misunderstanding.' If a defendant receives no advice regarding a direct consequence of his or her guilty plea, the plea is potentially a product of 'ignorance.'" *Id.* at 476 (concluding that a failure to advise the defendant of lifetime supervision requirements rendered the pleas involuntary); *but see Jaco*, 120 S.W.3d at 831-32 (concluding that the plea was voluntary even though petitioner was not informed of criteria that would determine his release upon reaching the release eligibility date).

The record supports trial counsel's testimony and the post-conviction court's finding that the Petitioner is an intelligent person. He had some prior experience with the criminal justice system, including misdemeanor offenses, an arrest for aggravated assault, and a juvenile felony escape conviction. The Petitioner testified at the plea hearing that he understood the terms of his plea agreement and that he had not been pressured or

coerced into entering the agreement. Generally, "[a] petitioner's solemn declaration in open court that his plea is knowing and voluntary creates a formidable barrier in any subsequent collateral proceeding because these declarations 'carry a strong presumption of verity.'" *Dale Wayne Wilbanks v. State,* No. E2014-00229-CCA-R3-PC, 2015 WL 354773, at *10 (Tenn. Crim. App. Jan. 28, 2015) (quoting *Blackledge v. Allison,* 431 U.S. 63, 74 (1977)).

Trial counsel stated that he discussed the range of punishments available with the Petitioner and that he told the Petitioner that his range of punishment would depend on any convictions on his record prior to the commission of the crimes. However, trial counsel also told the Petitioner that he could potentially be sentenced to 75.5 years in prison and that he could receive a life sentence. The trial court, in accepting the guilty pleas, listed the potential punishments spanning from Range I to Range III and never informed the Petitioner that he could not actually receive a Range III sentence for his crimes. In *Dedrick Patton*, this court also addressed the voluntariness of a plea entered when the petitioner had been advised he could receive a Range II sentence despite the fact that he was a Range I offender, and concluded that because "neither the state, the defense, nor the trial court was aware of whether the petitioner qualified as Range I or II at the time of his plea, it cannot be said that … the plea was knowingly and intelligently entered, with a full and accurate appreciation of the potential penalties." 2003 WL 22999443, at *7. We conclude that in this case, likewise, the Petitioner's misunderstanding of his sentencing exposure renders the pleas involuntary.

## CONCLUSION

Based on the foregoing, we reverse the post-conviction court's denial of relief and remand for a new trial.

_____
JOHN EVERETT WILLIAMS, JUDGE

- 19 -